In re INSLAW, INC.
Debtor-in-Possession.

**Bankruptcy No. 85–00070.**

United States Bankruptcy Court,
District of Columbia.

March 13, 1989.

Charles A. Docter, Loren L. Chumley, Docter & Docter, P.C., Michael E. Friedlander, McDermott, Will & Emery, Washington, D.C., for debtor.

Deborah H. Devan, Weinberg and Green, Baltimore, Md., for Dickstein.

## MEMORANDUM OPINION OVERRULING DEBTOR'S OBJECTION [P. 925] TO THE PROOF OF CLAIM OF DICKSTEIN, SHAPIRO & MORIN FOR COMPENSATION AS DEBTOR'S FORMER SPECIAL COUNSEL

JAMES F. SCHNEIDER, Bankruptcy Judge, Specially Assigned.

This matter came on for hearing before the undersigned U.S. Bankruptcy Judge to whom the instant bankruptcy case was specially assigned. Based upon all of the evidence and for the reasons stated, the debtor's objection to the fees claimed by Dickstein, Shapiro & Morin as special counsel will be overruled.

The issue in this case is whether *all* counsel fees ought to be denied to this claimant because of allegations that it betrayed its client, the Chapter 11 debtor-in-possession which engaged it, with court approval, to file suit against the U.S. Government. In the course of the following opinion, this Court specifically holds that the law firm is entitled to be paid the full amount of its claimed fees because its representation of this debtor was undertaken and maintained in good faith; the quality of its services rendered was first-rate and beneficial to the debtor; the special counsel's actions on behalf of the debtor were properly motivated at all times; and its withdrawal as special counsel was consensual and wholly justified by acts and omissions of the debtor. Furthermore, counsel is entitled to be reasonably compensated for its efforts expended in overcoming the debtor's objection to its fees and in rebutting the unproven aspersions cast upon its reputation. This Court is convinced that the charges against Dickstein, Shapiro & Morin are unfounded.

### FINDINGS OF FACT

1. The instant Chapter 11 bankruptcy case of Inslaw, Inc. ["Inslaw"] was commenced by its filing of a voluntary petition in the U.S. Bankruptcy Court for the District of Columbia on February 7, 1985.

2. The debtor-in-possession is engaged in the business of manufacturing and marketing computer software products for

case control and workflow management in courts, insurance companies and law and justice entities. It evolved from an earlier non-profit corporation founded in 1973 as "The Institute for Law and Social Research" by William A. Hamilton and Dean Merrill. Mr. Hamilton is president and chairman of the board of Inslaw.

3. On February 12, 1986, Inslaw filed its *Application to Employ Dickstein, Shapiro & Morin as Counsel to Debtor* [P. 286], which contained the following statements:

[4.] As this Court knows from prior hearings before it, the Debtor has substantial claims against the United States Department of Justice which the Debtor has been endeavoring up to this time to negotiate the resolution of with the Justice Department. However, it has now become obvious to the Debtor that only litigation will lead to a resolution of these problems. Dickstein, Shapiro & Morin is a law firm renowned for its ability, especially in the field of litigation having represented many of the major corporations in this country, in complicated litigation matters. In addition, the firm has several lawyers who are expert in the field of Government Contract Law.

[5.] On April 22, 1985, this Court entered an order Authorizing the Employment of Howrey & Simon to represent the Debtor in connection with its Government contract claims against the Justice Department before the Department of Transportation Board of Contract Appeals. Said counsel have decided to withdraw from the case and not to pursue any broad new litigation effort.

[6.] To the best of Debtor's knowledge, Dickstein, Shapiro & Morin have no connection with Debtor, the creditors, or any other party in interest, or their respective attorneys. However, it should be noted that Dickstein, Shapiro & Morin do on occasion represent AT & T and International Brotherhood of Electrical Workers (IBEW), both of whom are creditors in this case. However, as this Court knows from other proceedings in this case, AT & T is represented in this case by Ravin, Sarasoh, Cook, Baumgarten & Fisch, 80 Main Street, West Orange, New Jersey 07052, and IBEW is represented by Covington & Burling, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20044.

[8.] [sic] Your Applicant desires to employ Dickstein, Shapiro & Morin under a general retainer because of the extensive legal services required. Dickstein, Shapiro & Morin and the Debtor's president, William A. Hamilton, have negotiated a retainer letter dated February 5, 1986, a copy of which is attached hereto and incorporated herein fully by reference. The conditions and terms stated in the letter are, of course, subject to the approval of this Court. The letter sets out the hourly charges that will be charged during different phases of the litigation. It also provides for a success fee in addition to the hourly rates in the event of a successful conclusion of the matter. The agreement further states that Dickstein, Shapiro & Morin anticipate that the discovery phase of the litigation will require approximately $150,000.00 of lawyer time. In addition, the letter indicates that the firm will submit its first bill for payment on or about February 15, 1986 in the amount of $25,000.00 which is to be applied against the hours spent for the period January 16, 1986 to February 28, 1986.

*Application* [P. 286].

4. By Order [P. 307] of the U.S. Bankruptcy Court [Bason, B.J.] entered March 11, 1986, Dickstein, Shapiro & Morin ["D.S. & M."] was appointed special counsel to the debtor-in-possession to conduct litigation on its behalf against the United States Department of Justice ["D.O.J."], *nunc pro tunc* as of January 16, 1986.

5. D.S. & M. is a large Washington, D.C. law firm engaged in the general practice of law, comprised of 50 partners and 34 associates.

6. The Order incorporated by reference to a letter retainer agreement [Inslaw Exhibit No. 1] dated February 5, 1986, the terms and conditions of the employment

"under a general retainer" of D.S. & M. by Inslaw, as follows:

This will confirm our understanding regarding retention of this firm by Inslaw to engage in litigation on its behalf against the United States Government.

You have advised us that all efforts to achieve a negotiated settlement with the Department of Justice on your outstanding claims have been exhausted. You have told us that you do not believe it is in the interest of Inslaw to pursue negotiations any further and that litigation is the only available course of action to protect Inslaw's financial position. We have agreed to seek a litigated solution to your outstanding claims. In recognition of the financially weakened condition of Inslaw which results directly from the Department of Justice's failure to pay these claims, we have agreed to waive a portion of our fees in exchange for a contingent success fee. It is understood that we will not seek a negotiated settlement on your behalf. In the unlikely event that you decide to accept a settlement offer, however, we have made provisions in our fee arrangement for that contingency.

Accordingly, subject to the approval of the Bankruptcy Court, we agree to file suit or otherwise pursue Inslaw's claims against the United States Government with regard to all of the claims against the Department of Justice arising out of your prior contractual relationship with them that have been discussed with us during the past several weeks.

We will be reimbursed by Inslaw for our efforts in accordance with the following schedule:

—Commencing January 16, 1986, and continuing until we have completed a discovery schedule established by the appropriate judicial forum, or until a settlement agreement is final, whichever comes earlier, we will be paid at our regular hourly rates. In the case of myself this amount is $180. My partner, Richard Conway, will be billed at $170 and all other attorney or paralegal time will be billed at this law firm's normal rate for that person. At this time we anticipate using one other attorney, George Brown, and his rate is $95.

—If you agree to settle before discovery is complete, you will pay us a 7.5% success fee in addition to our hourly rates.

—If the case does not settle, then, when the discovery schedule is concluded (including any motions and argument for Summary Judgment) we will advise you on the prospects for success or settlement. If you and I agree that this case should be vigorously pursued thereafter, we will continue to provide you with complete legal services for that purpose at not more than 60% of the foregoing rates nor less than 40% depending on our estimate of the prospects for success. (Nothing in this agreement shall impair our right to increase our hourly rates in 1987 by up to 15%). Thereafter, if the case settles or you receive a judgment in your favor, we will be paid 15% of the amount of the settlement or judgment in addition to the discounted hourly rates referred to in this subparagraph.

—We will render bills monthly and submit them to the Bankruptcy Court at such intervals as the Court schedules. It is understood that these bills will be paid within 10 days of the Court's approval of our periodic submissions.

—It is our expectation that our fee through the discovery period, not including out-of-pocket expenses, will be approximately $150,000 and that discovery should be complete within six to nine months. In lieu of a retainer, we will submit our first bill for payment to you on or about February 15, 1986 in the amount of $25,000.00. This sum shall be applied against our hours for the period January 16–February 28.

Inslaw Exhibit No. 1.

7. The Order further approved the payment of a $25,000 retainer to D.S. & M. "to be applied against hours devoted to the case by said law firm for the period Janu-

ary 16, 1986 to February 28, 1986, subject to later review by this Court after notice to parties in interest as required by the Bankruptcy Code."

8. The litigation which D.S. & M. was engaged to pursue against the D.O.J. was filed in both the U.S. Bankruptcy Court and in the Department of Transportation Contract Appeals Board ["D.O.T.C.A.B."].

9. Because the letter agreement between Inslaw and D.S. & M., written by Leigh S. Ratiner, a partner in D.S. & M., did not indicate that multiple actions against D.O.J. would be filed in different fora, it did not specify terms of payment identifiable to each of the separate proceedings which D.S. & M. caused to be filed.

10. The D.O.T.C.A.B. actions involved complex legal issues of contract law, including the determination of amounts payable to Inslaw by D.O.J.

11. The adversary proceeding instituted by D.S. & M. in the bankruptcy court on behalf of Inslaw against D.O.J. was based upon the novel legal theory that D.O.J. had violated the automatic stay of 11 U.S.C. § 362(a) by converting to its own use Inslaw's property after the filing of the bankruptcy petition. Inslaw had developed a number of enhancements to a computer software system in the public domain known as "PROMIS." The bankruptcy complaint was based upon the allegation that approximately 1,000 such enhancements to the system had wrought such qualitative improvement to it that "PROMIS" had become the private property of Inslaw and that its continued use by D.O.J. violated the automatic stay. *Complaint*, Inslaw Exhibit No. 4.

12. William Hamilton, Inslaw's chief executive officer, represented to D.S. & M. that the majority of Inslaw's 1,000 enhancements to the system were privately funded, that D.O.J. had not paid for them and that certain clauses contained in contracts between Inslaw and those private entities which funded the enhancements, known as "rights-in-data clauses," precluded D.O.J.'s unrestricted use of "PROMIS."

13. D.S. & M. filed the adversary complaint against the D.O.J. in the U.S. Bankruptcy Court on June 7, 1986.

14. Before filing the complaint, and notwithstanding the contrary language in the letter retainer agreement, at the specific behest of William Hamilton, D.S. & M. pursued settlement negotiations with D.O.J. in May, 1986. Leonard Garment, D.S. & M. senior partner, who was understood by Mr. Hamilton to know a number of top officials at D.O.J., was asked by Mr. Hamilton to commence settlement negotiations with D.O.J. at the highest levels. Because no settlement resulted from Mr. Garment's efforts, the complaint was filed.

15. There is nothing in the record to suggest that Mr. Garment's meeting with D.O.J. was undertaken without full knowledge of Inslaw through Mr. Hamilton.

16. The time expended on the bankruptcy litigation by D.S. & M. from February, 1986, until the filing of the complaint in June, 1986 was devoted to extensive consultation with William Hamilton, research regarding potential causes of action, initial discovery, settlement efforts, and the drafting of the complaint. *First Application for Interim Compensation*, [P. 388].

17. Mr. Hamilton took an active hand in guiding the direction of Inslaw's prosecution of D.O.J. and frequently gave D.S. & M. detailed suggestions and instructions regarding specific components of the litigation. He was personally involved in settlement efforts to the extent that he sent a six-page letter [Inslaw Exhibit No. 9] dated August 21, 1986 to Arnold I. Burns, Deputy U.S. Attorney General, setting forth Inslaw's claims against D.O.J., in an effort to effect a settlement.

18. D.S. & M. has filed three applications for compensation, the second and third applications superseding each of its predecessors.

19. The first application [P. 388], which was filed on August 20, 1986, covered the period from February through June, 1986 and requested interim compensation in the amount of $194,144.00 and reimbursement for out-of-pocket expenses in the amount of $22,394.74.

20. The second application [P. 432], which was filed on December 1, 1986, covered the period from July through September, 1986, in the amount of $149,290.47, reimbursement of out-of-pocket expenses in the amount of $7,920.47 and the balance remaining unapproved from the first application in excess of $125,000.

21. The third and final application [P. 710], which was filed on November 13, 1987, requested total compensation for all work performed by D.S. & M. in the amount of $464,096.31, including unpaid balances from the first two applications, and compensation for work performed during the period from October, 1986, through February, 1987, in the amount of $92,532.50 and reimbursement of out-of-pocket expenses in the amount of $5,734.60.

22. Leigh Ratiner wrote the following letter to William Hamilton dated August 5, 1986 which detailed the legal services rendered to Inslaw by D.S. & M. from February through June, 1986:

"This letter details the legal services we rendered in our role as counsel for the litigation we instituted on behalf of Inslaw against the United States Department of Justice ('DOJ').

"At the time of our retention, Inslaw contemplated that its various claims against DOJ could be assembled and prosecuted in a single proceeding. Thus, I, the DS & M attorney you initially contacted to handle the litigation was to be assisted by two other attorneys (Rick Conway and George Brown) on the matter. At this point in time, it appeared that Inslaw would be a rather straightforward government contract case, and both DS & M and Inslaw contemplated that this very lean staff could tackle the case and carry it through the discovery phase for a fee of approximately $150,000.00. Our retainer letter reflected this expectation. As is detailed below, however, this matter has proven to be dramatically more complex than was initially anticipated. In listening to you relate your story and in reviewing the documents you provided us on an almost daily basis, DS & M began to appreciate the magnitude of the harm done to Inslaw. You, moreover,

engaged us to vigorously pursue each and every element of Inslaw's claim, pursuant to your commitment to secure vindication for the wrong DOJ inflicted upon Inslaw. DS & M has attempted to be responsive to those demands. To vindicate Inslaw's rights we investigated a number of jurisdictional issues and analyzed a number of legal theories before focusing the action on a violation of the automatic stay. The following traces our legal services.

I. *Proceedings to Date*

A. *February: Early Activities*

"It quickly became apparent that the successful prosectuion of Inslaw's claim against DOJ would be anything but a straightforward task; the problem facing Inslaw and DS & M was remarkably complex and multidimensional.

"Information I, Rick Conway and George Brown gathered during the first month of DS & M's representation gradually developed to the point where it began to appear that DOJ's withholding of funds due Inslaw and contesting of Inslaw's ownership rights in its key product, namely 'enhanced PROMIS,' was a principal cause of Inslaw's bankruptcy. Further, you informed us that DOJ had had contacts with current or potential Inslaw customers and either disparaged Inslaw or intimated that DOJ would make enhanced PROMIS available for free. Motivation for DOJ's actions was unclear, but you stated that the presence of a fired Inslaw employee as PROMIS implementation contract manager for DOJ suggested an active and malicious bias against Inslaw.

"As a result of this information, we identified claims for breach of contract, maladministration, tortious contract breach, conversion, violation of the automatic stay, taking of property without just compensation under the Tucker Act and the fifth amendment to the United States Constitution, intentional interference with contract relations, defamation, disparagement, violation of confidentiality of trade secrets, violation of the Trade Secrets Act and Administrative Procedure Act, and the intentional tort of destruction of a business, as poten-

tial causes of action available to Inslaw against DOJ. Each needed to be thoroughly researched and investigated. This substantial task was compounded by the presence of multiple and potentially conflicting grants of jurisdiction bearing upon resolution of the various potential causes of action. The jurisdiction of this Bankruptcy Court, the United States District Court, the Department of Transportation Board of Contract Appeals ('DOTCAB'), and the United States Claims Court were all potentially touched by the claim. Larry Garr, a DS & M attorney with bankruptcy experience, was brought in to assist Conway, Brown and me to analyze the extent of the bankruptcy court's jurisdiction and determine the extent to which the voluminous facts in the case might reveal DOJ violations of the automatic stay.

"These efforts absorbed approximately 132.50 attorney hours in February.

### B. *March: Continued Analysis*

"In March Garr completed analysis of the co-existence of jurisdiction in administrative tribunals under the Tucker Act and the Bankruptcy Court under 28 U.S.C. § 1334. In particular, the expanded waiver of the United States' sovereign immunity present in the 1984 Bankruptcy Code, 11 U.S.C. § 106, was examined. A memorandum was prepared on the various issues and supporting case authority. Attention began to focus on the Bankruptcy Court as it became more apparent that DOJ might have violated the automatic stay and that relief for that violation could be achieved only in the Bankruptcy Court.

"Brown performed an initial, parallel effort on tort jurisdiction in Bankruptcy Court. Brown was also assigned the task of organizing the factual side of the case, and began a review of the basic contract documents. During this time, he also began to assemble thousands of related documents—a task that was ultimately to consume a tremendous amount of his time and paralegal time. You continued to organize the events and documents regarding your relationship with DOJ and your understanding of the motivation of its personnel. DS & M received documents and explan-

atory memoranda packages from you most days of the month. Each package had to be sorted and reviewed.

"Conway's efforts in March were mostly as a consultant since his overall responsibility was for the case which would be brought at DOTCAB in June. He was consulted and did perform an advisory role in litigation strategy and government contract issues. In particular, Conway arranged transfer of litigation responsibility over the DOTCAB matter from Howrey & Simon to DS & M.

"I continued to devote my time to an independent review of the documents and other available information which we were receiving from you. I also began reviewing the jurisdictional research in order to analyze our options in deciding where to file. I developed a notice to DOJ of DOJ actions Inslaw believed to be in violation of Inslaw's ownership rights in enhanced PROMIS. Early in the month you informed us that DOJ, in excess of its rights under the implementation contract, was contracting with PRIME Computer, Inc. ('PRIME'), for installation of enhanced PROMIS in additional United States Attorney Offices ('USAOs'). The proposed contract with PRIME also posed a threat of disclosure of Inslaw's trade secrets in enhanced PROMIS outside DOJ. Conversations and meetings with DOJ attorney Dean Cooper led to a DOJ offer to protect the confidentiality of PROMIS by not disclosing it to PRIME and by obtaining confidentiality agreements from DOJ employees leaving the Department if Inslaw would avoid seeking injunctive relief.

"As the month developed, so did evidence that serious bias against Inslaw existed at DOJ. Simultaneously, DS & M learned of the Congressional movement towards hiring private attorneys to do debt collections for the United States, even though USAOs with PROMIS had shown spectacular increases in debt collections. It seemed apparent that if PROMIS were fully implemented in all USAOs, as originally planned, the bill for private attorneys would be unnecessary. I assimilated this information and developed it for use in a Congressional

setting where pressure for settlement of the case would be developed. Notably, although Inslaw believed, at the time of DS & M's retention that settlement was not a viable option, it had begun to revisit the issue.

"These efforts absorbed approximately 323 hours.

### C. *April: Settlement Strategy and Litigation Preparation*

"April saw DS & M's effort on behalf of Inslaw track into two areas—one towards settlement of the case and the other towards development of a complaint against DOJ.

"The settlement effort was directed at DOJ and employed Congressional pressure as well. Inslaw believed that the DOJ bias that worked to its harm in the contract process would also work to block normal administrative efforts at settlement, and Inslaw requested DS & M to direct settlement efforts at a high enough level in the Government to permit consideration of the matter by unbiased personnel.

"Brown and Garr, assisted by junior associates, Sherri Floyd and Brad Ortins, and a law clerk, Peter Goldman, continued the litigation side of our effort by beginning to research the numerous legal theories previously noted as well as theories of abuse of a public office and professional ethics obligations, constitutional torts, tort immunity, RICO, slander/libel and conversion. Brown also continued to devote substantial time to the documentary organization and analysis process. A master chronology and explanatory index of documents was also prepared. In addition, Brown reviewed the chronology to master the facts and drafted the initial complaint.

"In April Inslaw received overtures from another company about a possible purchase of Inslaw. Corporate counsel Neil Lefkowitz and Rebecca Wright, in conjunction with Garr, Conway and me analyzed the parameters of the offer and its effect on the prospective litigation.

"I spent the balance of my time reviewing documents Brown and Wiggins, a paralegal, had collected, developing the settlement scenario, managing the case and maintaining extensive contact with the client.

"These efforts consumed approximately 651.50 hours.

### D. *May: Revision of Complaint and Settlement Efforts*

"The settlement effort in May focused on testimony before the House Subcommittee on Administrative Law and Government Relations. A paralegal prepared a visual presentation of the improved debt collection from PROMIS.

"On the litigation side certain issues were segregated for treatment in the DOT-CAB and certain issues were identified for prosecution in the Bankruptcy Court. Two documents were generated for the bankruptcy proceeding: an Information Memorandum to the DOJ that presented substantial, factual detail supporting Inslaw's grievance; and the complaint itself. It was determined that, a short period of time prior to the service of the complaint the factual material should be presented to DOJ in a final attempt at settlement negotiations. In recognition of the seriousness of the allegations being raised in the Information Memorandum, we reviewed the facts supporting the memorandum with you in very great detail. Associate Ronald K. Perkowski assumed principal responsibility for the drafting of the Information Memorandum, a partner Michael E. Nannes, with considerable experience in litigation, assumed responsibility for drafting the final revision of the complaint.

"Also during this time, Floyd, Garr and Ortins finalized their research efforts and associates Leanne Shank, Laura Menchero and John Schmit were brought on the litigation team to research the parameters of a cause of action for a violation of the automatic stay as well as other bankruptcy provisions. There were also a number of procedural issues that were resolved before the complaint was filed.

"Nannes and I attended settlement meetings with DOJ beginning in late May. Those negotiations were not successful and the Complaint was filed on June 9, 1986.

"These efforts amounted to 1,092.75 hours.

### E. *June: Continued Legal Research, Initial Discovery*

"In the settlement negotiations with DOJ, DOJ made it clear that, as anticipated, it would be filing a motion to dismiss and/or to withdraw the reference of the matter to the Bankruptcy Court. These Motions were served July 25, 1986. George Brown undertook substantial research in anticipation of those arguments and in recognition that Inslaw would have but a short period of time to respond. Initial discovery requests were generated, principally by Perkowski, and coordinated with all litigation counsel for both proceedings. Effort was also devoted to beginning preparation for defensive discovery, and Nannes and Perkowski met with Inslaw representatives to begin formal document collection. It was anticipated that advance preparation in this effort could minimize attorney involvement and expense to the Debtor in the process of discovery compliance.

"During June, a Complaint was prepared and filed with the DOTCAB, under the direction of Conway and Brown. I continued various efforts at settlement, early in the month, and in the latter part of the month assisted Inslaw in its dealings with respect to a threatened takeover effort from a hostile company. I also coordinated the efforts in the two proceedings.

"These efforts absorbed 746 hours.

### II. *Prospective Case Organization*

"At the present time, DOJ's motions with respect to dismissal and/or withdrawal of the reference are *sub judice*. This Court's resolution of those motions will, of course, determine the future course of our representation.

"If the matter proceeds as hoped and anticipated, the cases will be staffed as follows. I will continue my role as manager and "hands-on" supervisor of all Inslaw matters, handling relationships with you, coordination with bankruptcy counsel, and assuring consistency in the two legal actions. Conway and Brown will conduct the litigation in the Board of Contract Appeals and Court of Claims arising directly out of the contract. Nannes and Perkowski will be responsible for the litigation in this Court, with assistance from Brown based upon his documentary organization and analysis. Two junior associates have been principally committed to the pursuit of various research efforts in the two cases.

"It is anticipated that substantial time will be devoted to reviewing documents produced by DOJ in response to Inslaw's discovery request and will thereafter be followed by deposition discovery which may or may not be consolidated with some of the discovery in the Board of Contract Appeals cases.

### III. *Concluding Observations*

"DS & M recognizes that the legal fees and expenses incurred to date are substantially in excess of the fees and expenses that were anticipated at the commencement of its engagement. As is detailed above, however, the matter in issue has proven to be dramatically more complex than was initially anticipated.

"We have voluntarily adjusted your bill by absorbing approximately 23% of the total. We are holding, for later billing $20,-613.75. This latter amount corresponds to matters on which you requested service but are not being billed until the Court clarifies the scope of our retainer agreement.

> "Sincerely,
> /s/
> Leigh S. Ratiner"

*Letter dated August 5, 1986,* Inslaw Exhibit No. 7.

23. Inslaw did not object to the first interim application for compensation of D.S. & M. and supported the application when it came on for hearing before the U.S. Bankruptcy Court [Bason, B.J.]

24. At the hearing before Judge Bason on September 30, 1986, Mr. Ratiner furnished the following explanation to the bankruptcy court for the increased fee request:

> Your Honor, if I could just provide the Court with one short explanation for most of that discrepancy between our

estimate and actual hours. We have commenced litigation in the Board of Contract Appeals, having filed by now either two or three complaints—I'm not in direct, day-to-day contact with that litigation.

That was the litigation for which the estimate was originally given.

If I can draw the Court's attention to our February 5th retainer letter, the Court will notice that we refer at the bottom of page one to litigation with regard to all of the claims against the Justice Department arising out of your prior contractual relationship. Those claims are the ones referred to in this letter.

I suppose technically it could be argued that this retainer agreement does not cover the action that was brought in this court. I would hope that it could be read amply enough to cover that because it seems to be where the debtor has his best cause of action, at least in our judgment ...

But I think it's fair to say that the effort anticipated when the February 5th letter was written, which was on the basis of Mr. Hamilton's review with us of all the facts arising out of the contract, that letter preceded our knowledge or ability to know that an entirely different cause of action would be brought in bankruptcy court.

As you know from our prior hearing on [the] motion to dismiss, a considerable amount of effort and research went into what I believe you, yourself, Your Honor, thought might be more probable causes of action. And so numerous blind alleys were found and much diligence was put into the effort to find suitable causes of action. We think we have now found them.

So I think that while our fee does seem high—it seemed quite high to me when I first got the computer printouts—that is the explanation.

The case was not originally staffed quite as leanly as it should have been, and for that reason I have voluntarily written off approximately twenty-four percent of our fees and never billed Inslaw for those fees ...

At the time that letter was drafted, Your Honor, it was anticipated that the primary litigation would occur either in the Claims Court or in the Board of Contract Appeals, or both.

I believe that it was known at the time both by my firm, by Mr. Docter and also by Inslaw that there was an interest in pursuing the idea of the claim for the violation of the automatic stay under the Bankruptcy Code.

That idea was simply a germ of an idea at the time that letter was written. We did immediately pursue that option, both on our own, as well as at the direction of the client, and found it to be a promising avenue. But that occurred after the February 5th letter.

So I cannot say to you that we only contemplated the contract dispute cases at the Board of Contract Appeals. But what I can say to you is we were not then in a position to have the slightest idea of what bringing a case in this Court would mean, in terms of effort.

*Transcript*, September 30, 1986 Hearing, pp. 13–15, 19–20, [D.S. & M. Exhibit No. 34].

25. D.S. & M.'s first interim application for compensation exceeded the estimated fees set forth in the letter retainer agreement, but Inslaw acknowledged that D.S. & M. had performed necessary and valuable services not anticipated at the time of the agreement, many of them at the express request of William Hamilton. At the September 30, 1986 hearing, Charles Docter, bankruptcy counsel for the debtor-in-possession, speaking on behalf of his client, referred to D.S. & M. as "a reputable firm" and endorsed the fee application:

As Your Honor knows, Howrey and Simon in the early stages of this case were retained to handle a case before the Board of Contract Appeals which actually had been handled by another law firm, and the people from Howrey and Simon left that law firm and went to Howrey and Simon, and that's how this happened.

The focus of that representation, because of the long-standing relationship of the debtor with the attorney at Howrey and Simon, had never been examined into as to the bankruptcy interplay between what they were doing, and we felt we had enough to do in this case without getting into that.

However, when it became obvious that the bankruptcy interplay was not going to be developed and when certain problems did occur, finally, we were fortunate enough to get Dickstein and Shapiro to come in here, and that meant the entire approach had to be put into the context of a Chapter 11 debtor ...

And what Dickstein and Shapiro did was something that was absolutely necessary. Because of the complexities of the relationships involved, Mr. Hamilton would tell me and would tell other counsel about little facets of it, but none of us could concentrate on that phase of it, and it needed someone to pull all the pieces together.

And of course that's where these volumes of information now are organized so people know exactly what they're doing. And even, I would say, I know of at least one instance where Mr. Hamilton himself, only when Dickstein and Shapiro told him to go back to his time—his daily log and the calendar, recalled an event of enormous significance, that had been lost sight of in the events as they occurred in the normal course of the day.

I think that all of that was not apparent on February 5. I think as the digging started it just became more and more obvious that they had to go deeper and deeper because of the development of the facts that may not have been properly developed completely before, and also because of the bankruptcy interrelations to those facts.

*Id.,* pp. 26–28.

26. In the course of the September 30, 1986 hearing, Judge Bason stated his decision on the record regarding the award of fees to D.S. & M.:

Let me say that the Court is fully convinced that the firm of Dickstein, Sha-piro and Morin is providing excellent service to this debtor. And I say that both on the basis of the brief exposure that I had on the occasion of the hearing on the motion to dismiss and documentation that was filed both before and after that hearing, and also on the basis of the general reputation of that law firm.

And I'm fully convinced that everything Mr. Ratiner has said concerning the diligence and single-mindedness of the firm's pursuit of the client's objectives is concerned [correct?]. Nevertheless, I am concerned about the overruns above the original estimation. I know these things can happen.

It does seem to me, however, that Mr. Goldstein's suggestion is a fair and reasonable one, and I hope that the Court's adoption of that suggestion will not cause the Dickstein and Shapiro firm to lessen its enthusiasm and dedication and devotion to the interests of the client.

I'm sure that won't happen.

So I will allow the fee claim at this time in the amount of a hundred twenty-five thousand dollars, and full payment of that amount, and reserve decision on the remaining fee application until the time that we have our next hearing with respect to fees.

And of course, with respect to the expenses, I will allow those in the full amount requested. That would be in accordance with the letter of Mr. Hamilton that the expenses, as I understand it, are to be paid forthwith and the fees to be paid on or about December 15th, 1986, with progress payment by about November 15th.

*Id.,* pp. 30–32.

27. The letter retainer agreement did not establish a firm limit of $150,000 to be paid as compensation to D.S. & M. through the period of discovery. Rather, the figure of $150,000 was merely the law firm's estimate of those fees. Inslaw Exhibits No. 1 and No. 7.

28. The Court [Bason, B.J.] did not treat the letter retainer agreement as establishing a limit of compensation when he awarded fees to D.S. & M. in the amount of

$125,000 under its first interim application by Order [P. 435] dated December 2. 1986 [*nunc pro tunc* as of September 30, 1986]:

ORDERED: That Dickstein, Shapiro & Morin is hereby allowed $125,000 and that the remainder of the balance due under Invoice Number 6271, attached to the First Application for Interim Compensation and Reimbursement of Expenses as Exhibit B, shall be deferred, until the next interim compensation hearing; and it is further

ORDERED: That *The Debtor shall make a progress payment to Dickstein, Shapiro & Morin by November 18, 1986, and an additional payment to Dickstein, Shapiro & Morin on or before December 15, 1986, for a total interim fee payment of $125,000;* and it is further

ORDERED: That the request of Dickstein, Shapiro & Morin for reimbursement of out-of-pocket expenses in the amount of $22,394.74 be, and it hereby is, allowed *and the Debtor is directed to pay said sum forthwith;* and it is further

ORDERED: That the above allowances are without prejudice to the rights of any interested party to object on any basis to the foregoing allowances, whether in connection with an application for final compensation or otherwise; and it is further

ORDERED: That the foregoing allowances are without prejudice to the Court's authority to review and approve the ultimate compensation herein payable to Dickstein, Shapiro & Morin; and it is further

ORDERED: That the payment of interim compensation to Dickstein, Shapiro & Morin shall be conditional and without prejudice to the rights of the Bank of Bethesda and the National Bank of Washington.

[Emphasis supplied.] *Order of December 2, 1986,* Inslaw Exhibit No. 11.

29. The fees and expenses awarded to D.S. & M. by the Order of December 2, 1986 were never paid.

30. Disagreements over litigation strategy and differences of opinion regarding valuation of the cases developed between attorney and client. One of the first such disagreements was William Hamilton's insistence that the complaint against D.O.J. contain a detailed narrative concerning the bias against Inslaw of D. Lowell Jensen, a former D.O.J. official who, by the time of the litigation, had left D.O.J. and had become a Federal Judge. A debate ensued between attorney and client regarding the advisability of including these detailed allegations against Jensen. The complaint, as filed, omitted the Jensen narrative which had been included in a draft complaint.

31. One ground for Inslaw's objection is that it contends that Leigh S. Ratiner was improperly discharged by D.S. & M. as a result of pressure from D.O.J.

32. Mr. Ratiner has denied that he left D.S. & M. because of pressure from D.O.J. He also denied that he ever told William Hamilton that he left D.S. & M. because of pressure from D.O.J.

33. Mr. Ratiner and Inslaw through William Hamilton and Nancy Hamilton, his wife, appear to have enjoyed a generally harmonious working relationship which nevertheless was not without its normal stresses and strains. The Hamiltons made various demands upon the firm which required D.S. & M. to expend additional time in prosecuting the case. There were disagreements between D.S. & M. and Inslaw even when Mr. Ratiner was lead counsel in charge of the conduct of the litigation.

34. Mr. Ratiner, now no longer a partner at D.S. & M., testified at the hearing on this objection that Inslaw was "a difficult client."

35. When Inslaw was notified that Mr. Ratiner was leaving D.S. & M., Inslaw filed an application [P. 425] on November 19, 1986, requesting an in-chambers hearing. The application contained the following statements:

Comes now Inslaw, Inc., the Debtor herein, by and through the undersigned counsel, and respectfully requests this court to grant an in chambers hearing for the reasons that:

1. The Debtor herein filed its Chapter 11 Petition on February 7, 1985. The Debtor is continuing its business and managing its property as a Debtor in Possession. A Creditors' Committee was appointed by the United States Trustee. Said Creditors' Committee has organized itself and is presently represented by counsel.

2. On November 14, 1986, the Court announced that it had reached its decision regarding the Justice Department's Motion to Dismiss the Complaint filed by the Debtor in Adversary Proceeding No. 86–0069, *Inslaw, Inc. v. United States of America and United States Department of Justice.* In a telephone conference call with opposing counsel on that date, the Court made known its intention to commence the trial of Count 3 on the previously scheduled date of February 27, 1987.

3. Certain information has come to the attention of the Debtor's management concerning this Adversary Proceeding which the Debtor believes is profoundly serious and which the Debtor believes must be brought immediately to the attention of the Court.

4. Because of the sensitive nature of the matters to be presented to the court in connection with the foregoing, it is requested that the hearing be conducted in chambers with attendance limited to those parties receiving notice of this application pursuant to the Certificate of Service appended hereto [William C. White, Esq., U.S. Trustee; Karen L. Myers Zauner, Esq., Piper & Marbury; Bruce Goldstein, Esq., Stephen E. Leach, Esq., Zuckerman, Spaeder, Taylor & Kolker; Elliot L. Richardson, Esq., and Glenn S. Gerstell, Esq., Milbank, Tweed, Hadley & McCloy]. Because of the urgency of the matters involved, the undersigned counsel is requesting the hearing to be held at the earliest possible convenience. It is expected that the hearing would take no more than forty-five minutes.

*Application* [P. 425].

36. The meeting with Bankruptcy Judge George F. Bason was requested by Inslaw based upon the unsubstantiated belief of Mr. Hamilton that Leigh Ratiner's departure from D.S. & M. had been caused by improper pressure on the firm by D.O.J.

37. The request for a meeting was made by Inslaw without advance notice to D.S. & M.

38. The reaction of D.S. & M. to the requested meeting and the events which followed are set forth in the following file memorandum, prepared by Michael Nannes, a D.S. & M. partner, dated November 20, 1986:

Yesterday at 3:00 p.m. I received, by hand delivery, an *Application For In Chambers Hearing* ("Application"), filed by Charles Docter on behalf of Inslaw. The document came as quite a surprise to me: although it pertained to the adversarial proceeding being directed by DS & M, it had not been cleared with us prior to its submission. In addition, the *Application* is slightly although not dangerously, inaccurate in its recitation regarding the court's intentions with respect to trial of the matter.

I immediately spoke with Leigh Ratiner regarding the matter. Leigh did not know of the *Application* and had not received it. Leigh deduced that the *Application* must relate in some manner to Leigh's contemplated departure from this firm.

Leigh and I placed a phone call to Docter at 4:00 p.m. We were advised that Docter was on the other line. When Docter did not return our call by 4:45 p.m., Leigh and I placed a call to Bill Hamilton. We asked Bill to explain the basis for the *Application.* Bill stated that, in the Chambers Hearing, he would tell Judge Bason that he had learned (from Leigh) that the primary architect of his litigation (Leigh) has indicated that he will be leaving DS & M, at the firm's choice, due to DS & M's disapproval of this litigation and the assertion of allegations against Lowell Jensen. Leigh corrected Hamilton's "representations"— Leigh *might* be leaving, and Leigh had "no evidence" that Hamilton's view of

the reasons for Leigh's departure was correct. Hamilton indicated that he would ask the court to hold up payment of DS & M's fees until he is satisfied (1) regarding the firm's intention to pursue the claim even if Leigh departs, and (2) that DS & M will aggressively pursue the matter against any and all people to whom the trail leads.

Leigh and I asked Hamilton what relief he intended to secure from Judge Bason. Hamilton reiterated that he wanted assurances that we would go forward with the case. He stated that he had learned, through a confidential source, that at a recent cocktail party, a DS & M attorney advised his source that DS & M no longer represented Inslaw. We told Hamilton that that was preposterous, had never been discussed here, and that Hamilton himself knows better inasmuch as the DOTCAB litigation (Conway's) is moving ahead full bore and is not the least bit controversial. Hamilton observed that when this case originally came into the office, there was no expectation that the trail would lead to senior Justice Department officials, and that if we had known that that would be the case, DS & M might not have gone forward with the case. It is Hamilton's opinion that this firm must be feeling some reaction to the involvement of Edwin Meese. He questions our future commitment to the case, and sees a potential conflict of interest given the firm's relationship with Meese. Upon questioning, Hamilton stated that, to date, he has had the assistance of "able, talented lawyers. I have received excellent representation."

Leigh then told Hamilton that he thought the appropriate course of action would be to sit down with our Managing Partner, Fred Lowther, so that Hamilton could be convinced of our firm's commitment to the case. I interrupted Leigh: the proper course *would have been* to have had such a conference *before* filing the *Application*. The issue/problem is now on the public record, apparently to be aired before opposing counsel. I told Hamilton that I thought serious damage

had been done to Inslaw's case—one we had striven mightly to render credible. This was all the more disturbing in light of the fact that we had *finally* had a significant success, and had been praised by the Court in the hearing on DS & M'S Fee Application. Now, with the *Application* making sinister references to "profoundly serious" and "sensitive" matters, this case has been tainted with a circus mentality. I sensed that Hamilton agreed with us, and now feels that he probably should have presented the matter to us for consideration before filing the *Application*.

Returning to the issue of this firm's representation, Hamilton stated the view that he could imagine that DOJ "had a hand in" having the firm ask Leigh to leave. Hamilton further noted a comparison of Leigh's draft Complaint with the Complaint ultimately filed; he seemed to be inferring that DS & M softened considerably in its zeal to attack Meese and Jensen (Hamilton noting that Glanzer has on occasion stated that "DS & M still has to do business with the people down there [at DOJ].") I responded to Hamilton that, with no offense to Leigh, I felt that if the two Complaints were laid side by side before any panel of five lawyers, they would all agree that the Complaint ultimately filed, and successful against the motion to dismiss, was the better Complaint. Leigh fully agreed with my observation and reminded Hamilton that the original Complaint was only intended as a negotiating document—not intended to be filed in that form. I also told Hamilton that *I* drafted the Complaint, and that my judgment was not influenced by Garment or Glanzer but only by my sense of what would make a good litigation document.

Hamilton stated that he would like to have a meeting with the firm's Managing Partner. The discussion then moved towards what we do with the *Application*. I stated to Hamilton that I believed there were no circumstances under which I could see the hearing going forward: if Hamilton is not satisfied by our commitment to the case, we would withdraw.

Leigh added that if we go to court we (1) open our case to our adversaries, (2) impune [sic] the firm, and (3) expose Leigh to significant embarrassment if and when it becomes necessary for the firm to state that the reasons for Leigh's departure are others than those perceived by Hamilton.

Hamilton indicated that he would talk to Charles Docter, Nancy Hamilton, and Charles Work (a close advisor and Hamilton's attorney) and get back to us Thursday morning.

It is my opinion, which I stated to Hamilton in the phone call, that the mere filing of this document has done serious damage to Hamilton's case. It is also my opinion, not stated to Hamilton, that it is unlikely that DS & M can continue with this case. When our client does not trust us; causes papers to be filed behind our back in, and to the detriment of, our difficult case; and seeks to compel the firm to take a "blood oath" with respect to our loyalty in front of a judge, the relationship is dead. Add to this (1) that Nancy Hamilton called Leanne Shank (not me) seeking my notes of the call with Judge Bason, apparently to develop support for this *Application*, and (2) that the *Application* is based on information given *in confidence* to Hamilton and Docter. Furthermore, I think Hamilton is setting us up: if we in our professional judgment determine it is not appropriate to depose Jensen, Hamilton will throw the developments of the past few days in our face. We must be permitted to exercise independent, not threatened, professional judgment on behalf of our client.

Leigh has reviewed this memo and agrees with the factual recitations. The last paragraph is mine.

*Memorandum,* Inslaw Exhibit No. 34.

39. Despite the disastrous effect Inslaw's Application had on the relationship between attorney and client, D.S. & M. made the effort to have direct discussions with Inslaw to clear the air.

40. A meeting was held on November 21, 1986, between D.S. & M. and Inslaw.

Leigh Ratiner, Richard Conway, Michael Nannes and D.S. & M.'s managing partner, Frederick Lowther, met with William Hamilton and Charles Work, a partner with the law firm of McDermott, Will and Emery and a friend of Mr. Hamilton.

41. The November 21, 1986 meeting brought about a *rapprochement* between attorney and client, as evidenced by the following letter dated November 25, 1986 to Messrs. Work and Hamilton written by Frederick M. Lowther:

Dear Chuck and Bill:

I have your letter of November 24, 1986, Chuck, enclosing Bill's memorandum of November 24, 1986. Like you, I trust that the matters giving rise to Inslaw's November 19, 1986 Application For In–Chambers Hearing have been resolved and that this firm can continue to represent Inslaw effectively. As I stated at our meeting last Friday, one of my primary concerns was the appearance that a constructive attorney-client relationship had broken down, in which case we would have had little choice but to withdraw from our representation of Inslaw. While we have still not fully recovered from the shock of your having filed the Application without first addressing your concerns to us, I do believe that no permanent harm to our relationship with Inslaw has been done.

Given our mutual commitment to a strengthened relationship based on trust and confidence, I see no purpose in providing a line-by-line response to your letter. However, Chuck, I feel I should comment on two specific points in order to avoid any future misunderstanding. First, I do not recall saying that we would never reassign attorneys working on the Inslaw case. I did say that we could assure you that the case will be adequately staffed until its conclusion. I would ask you not to infer anything sinister from my additional comment; I simply want you to understand that attorneys like Mike Nannes and Rick Conway have a wide variety of responsibilities and there may come a time when other commitments (e.g., to a trial) make it

advisable to substitute other lawyers to perform particular assignments. I can assure you that no long-term changes in staffing will be made without clear advance notice to you. Secondly, your reference to devotion of resources at the highest level of the firm to pursue settlement carries our discussion a step beyond what I said. My intention is to discuss with senior partners whether they believe they can contribute to the settlement prospects. If they feel they can, then by all means we will apply those resources. If they feel they cannot, we will so inform you.

I also feel the need to comment on your memo, Bill. I have no problem, obviously, with your documenting meetings with us. However, I find inclusion of the statements and documentation concerning Lowell Jensen to be truly beyond the scope of our meeting. We are well aware of your feelings that Mr. Jensen is a key figure in the Inslaw bankruptcy. However, your memorandum makes such a major point of the Jensen involvement that we are concerned you have reached conclusions which cannot be supported by the evidence developed so far and/or may not be relevant to the current litigation. It is not our objective, nor should it be yours, to prove a point about any individual, if to do so would be unproductive or counterproductive to the case. As I made clear at our meeting, our objective is to achieve a satisfactory settlement or judicial determination on Inslaw's behalf. I can assure you that we will not decline to pursue any avenue which we judge will legitimately advance Inslaw's claim. I can also assure you, however, the [sic] we will insist on exercising our own professional judgment about the proper conduct of the litigation, consulting of course with you and your other advisors each step of the way. I sincerely believe that you would have it no other way.

As I said to you on Friday, I am always available to deal with any concerns or problems you may have and hope you will call me. I will, of course, contact both of you should there be any further concerns on this end.

Sincerely,

/s/

Frederick M. Lowther

*Letter dated November 25, 1986,* Inslaw Exhibit No. 37.

42. The meeting with Judge Bason was cancelled and D.S. & M. continued its representation of Inslaw.

43. In December, 1986, Richard Conway, D.S. & M. partner assigned to the D.O.J. litigation, learned for the first time that Inslaw's own documentation regarding enhancements to "PROMIS" fell far short of proving the existence of 1,000 privately-funded improvements to the computer software system, which had been alleged in the complaint filed against D.O.J.

44. In the opinion of Richard Conway, the credibility of William Hamilton had been severely impaired by the revelation that less than 200 of Inslaw's enhancements to "PROMIS" could be shown to have been privately-funded.

45. Mr. Conway testified to his belief that Mr. Hamilton's reduced credibility would adversely affect any hope of success at trial upon the complaint.

46. Mr. Conway also testified to a wealth of experience in the field of "Government Contracts Law," and stated that a significant reduction in the number of privately-funded enhancements to "PROMIS" would severely impair Inslaw's chances of recovery on its complaint and significantly reduce the value of any verdict which might be obtained against D.O.J. for violation of the automatic stay. He based this opinion upon the decision of the Armed Services Board of Contract Appeals in the case of *Bell Helicopter Textron,* ASBCA No. 21,192, 85–3 B.C.A. (C.C.H.) ¶ 18,415, 1985 WL 17050 (Sept. 23, 1985).

47. A number of meetings were held between the Hamiltons and D.S. & M. The firm recommended that all the cases against D.O.J. be settled for a figure of not less than $1 million. Mr. Hamilton refused to accept this advice.

48. The parties agreed that D.S. & M. would withdraw as special counsel, but that D.S. & M. would await the filing of a request for withdrawal by Inslaw.

49. On January 23, 1987, Inslaw filed an application [P. 442] to authorize the withdrawal of D.S. & M. as special counsel and the retention of Nixon, Hargrave, Devans & Doyle as replacement special counsel. By Order [P. 448] dated February 17, 1987, Judge Bason granted the application.

50. On April 15, 1987, Inslaw filed an application [P. 537] to authorize the retention of McDermott, Will & Emery and of Kellogg, Williams & Lyons as special counsel in lieu of Nixon, Hargrave, Devans & Doyle. On April 17, 1987, by Order [P. 538], Judge Bason approved the application.

51. On January 25, 1988, Judge Bason issued a lengthy written opinion in the adversary proceeding, holding that D.O.J. had violated the automatic stay and that Inslaw was entitled to damages. *In re Inslaw, Inc.*, 83 B.R. 89 (Bankr.D.D.C.1988).

52. On February 2, 1988, Judge Bason entered a Final Judgment Order [P. 456] in the adversary proceeding assessing compensatory damages under counts I, II and III against the United States of America and D.O.J. in the amount of $6,790,000, and reserving for future hearings the issue of consequential and exemplary damages.

53. The decision of the bankruptcy court was appealed by the defendants to the U.S. District Court for the District of Columbia, and a decision in that appeal is now pending.

54. The complaint filed by Inslaw against D.O.J. before the D.O.T.C.A.B. is still pending.

55. D.S. & M. filed a proof of claim [Claim No. 113] in the instant case on November 13, 1987 in the amount of $464,096.81, representing its full claim for compensation as special counsel to Inslaw, including out-of-pocket expenses.

56. The average hourly rates charged by D.S. & M. for work performed by attorneys were lower than the average hourly rates charged by debtor's bankruptcy counsel, debtor's substitute special counsel and counsel to the unsecured creditors' committee:

INSLAW, INC.
Summary of Legal Fees Requested

A. Dickstein, Shapiro & Morin
Totals: First through Third Applications (2/1/86—6/30/86):

| | | | |
|---|---|---|---|
| Attorneys | 4032.75 hours | 366,995.25* fees | 91.00 rate |
| Paraprof'ls | 1401.00 hours | 61,051.25 fees | 43.58 rate |

*The total fees requested for attorney time includes the amount of fees requested in the firm's first Application for Interim Compensation, which fee request included a 21.7 per cent reduction from the value of actual hours expended.

B. McDermott, Will & Emery
Totals: 1st through 6th applications (4/17/87—7/30/88):

| | | | |
|---|---|---|---|
| Attorneys | 7988.25 hours | 1,145,942.50 fees | 143.45 rate |
| Paraprof'ls | 2394.25 hours | 123,750.00 fees | 51.69 rate |
| Law clerks | 873.00 hours | 50,046.75 fees | 57.33 rate |

C. Docter, Docter & Salus
(Personnel billed at $35 and $40 an hour were presumed to be legal assistants or clerks, although not so designated).
Totals: 4th through 7th applications (2/1/86—4/30/87):

| | | | |
|---|---|---|---|
| Attorneys | 1110.40 hours | 189,757.31 fees | 170.83 rate |
| Assistants/ clerks | 99.90 hours | 3,484.50 fees | 34.87 rate |

D. Zuckerman, Spaeder, Goldstein, Taylor & Kolker
(Personnel billed at $40 and lower per hour were presumed to be legal assistants or clerks, although not so designated).

Totals: 4th through 8th applications (2/1/86—4/30/87):
Attorneys        231.42 hours        33,946.75 fees        146.69 rate
Assistants/
  clerks         12.75 hours           472.50 fees          37.06 rate

---

D.S. & M. Exhibit No. 29.

57. On September 29, 1988, Inslaw filed the instant Objection [P. 925] to the proof of claim filed by D.S. & M. for compensation as Inslaw's special counsel.

58. Inslaw claims that it was betrayed by D.S. & M. because (1) Leigh S. Ratiner, lead counsel in the bankruptcy court litigation against D.O.J. was fired by D.S. & M. on orders from D.O.J.; (2) D.S. & M. deleted references to D. Lowell Jensen from the complaint filed in the bankruptcy court in order to soften the case against D.O.J.; (3) D.S. & M. committed legal malpractice in failing to fully investigate the case before filing the complaint; (4) D.S. & M. committed legal malpractice by attempting to force Inslaw to settle the cases against D.O.J. without first pursuing complete discovery; (5) in pushing Inslaw to settle, D.S. & M. was improperly motivated by attempting to curry favor with D.O.J. and by attempting to settle for a figure that would only insure payment of D.S. & M.'s fees; (6) D.S. & M. abandoned Inslaw in the D.O.J. litigation when Inslaw refused to accept D.S. & M.'s ultimatum that it settle with D.O.J. or suffer its withdrawal as special counsel; and (7) D.S. & M.'s advice to settle all of the cases against D.O.J. for not less than $1 million was proven by events to have been legally incorrect.

CONCLUSIONS OF LAW

1. "The allowance or disallowance of claims against the estate" is a "core matter" within the exclusive jurisdiction of the bankruptcy court. 28 U.S.C. § 157(b)(2)(B) (1982 & Supp. IV 1986).

2. The allowance of counsel fees for an attorney representing a debtor-in-possession is a "core matter" affecting the administration of a bankruptcy estate which bankruptcy judges may hear and determine. 28 U.S.C. § 157(b)(2)(A) (1982 & Supp. IV 1986).

3. A Chapter 11 debtor-in-possession is authorized by the Bankruptcy Code to employ special counsel, as differentiated from general counsel in the bankruptcy case, to perform particular, limited services, *e.g.*, to conduct certain specialized litigation, regardless of whether the special counsel represented the debtor in the past. However, such representation must first be approved in advance by the bankruptcy court, must be "in the best interest of the estate," and the special counsel must "not represent or hold any interest adverse to the debtor or the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. §§ 327(e) and 1107(a) (1982 & Supp. IV 1986); *In re Roberts*, 46 B.R. 815 (Bankr.D.Utah 1985); *In re Fondiller*, 15 Bankr. 890 (B.A.P. 9th Cir.1981).

4. According to these terms, Inslaw's employment of D.S. & M. was wholly proper. It was approved in advance by the bankruptcy court (Bason, B.J.), upon an application which disclosed that D.S. & M. had represented two of Inslaw's creditors in the past, but not in connection with the instant bankruptcy nor with the litigation it was being engaged to conduct. Additionally, it appeared on the face of the application that the employment of such a "renowned" law firm, "expert in the field of Government Contract Law," would obviously be "in the best interest of the estate." *Application*, p. 286.

5. The letter retainer agreement dated February 5, 1986, which was incorporated by reference in the Court's Order [P. 307] entered on March 11, 1986, memorialized the understanding of the parties at the outset regarding the scope of D.S. & M.'s representation and their expectations as to counsel fees. The retainer agreement provided an estimate of what the fees would

be and did not establish a firm limit on compensation. Inslaw was informed of every increase in compensation requested. Indeed it demanded the work which resulted in those increases and even agreed to the higher compensation requested over that indicated in the letter retainer agreement at the time of the first application for interim compensation. This Court has the authority to approve compensation different from that proposed in the letter retainer agreement, where "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a) (1982 & Supp. IV 1986). *See Collier on Bankruptcy,* ¶ 328.02[2] (15th ed. 1988).

■ 6. By the same token, this Court has the authority to deny counsel fees in their entirety, if it determines at any time during the course of representation the existence of a conflict of interest on the part of counsel representing a debtor. 11 U.S.C. § 328(c) (Supp. IV 1986). Based upon the leading case of *Woods v. City Nat. Bank & Trust Co. of Chicago,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), it has been held that a bankruptcy court may deny all compensation to a debtor's counsel shown to have represented or held an interest adverse to the debtor, *In re Patterson,* 53 B.R. 366 (Bankr.D.Nev.1985); *In re Porter,* 52 B.R. 692 (Bankr.E.D.Va.1985); *In re Roberts, supra; In re Coastal Equities, Inc.,* 39 B.R. 304 (Bankr.S.D.Cal.1984); *In re Philadelphia Athletic Club, Inc.,* 38 B.R. 882 (Bankr.E.D.Pa.1984); *In re Chou–Chen Chemicals,* 31 B.R. 842 (Bankr.W.D. Ky.1983); and this denial of compensation has even included the requirement that counsel disgorge fees already paid, *In re Nashville Union Stockyard Restaurant Co., Inc.,* 54 B.R. 391 (Bankr.M.D.Tenn. 1985); *In re B.E.T. Genetics, Inc.,* 35 B.R. 269, 9 C.B.C.2d 1346 (Bankr.E.D.Cal.1983); *In re 765 Associates,* 14 B.R. 449 (Bankr.D. Hawaii 1981); and *In re Paine,* 14 B.R. 272 (D.W.D.Mich., S.D.1981). (*Cf. In re Devers,* 12 B.R. 140 (D.D.C.1981), which held that a bankruptcy judge cannot deny fees to debtor's bankruptcy counsel based solely upon a finding that counsel committed ethical violations, without specific factual findings that such violations reduced the value of services rendered to the client.)

7. The A.B.A. Model Code of Professional Responsibility, as amended, governs the conduct of members of the bar of the District of Columbia, having been adopted by the District of Columbia Court of Appeals. The same standards were made applicable to counsel practicing in the U.S. Bankruptcy Court for the District of Columbia by local rules adopted by this Court and the U.S. District Court. *See* Local Bankruptcy Rule 3(a)(5) and Local District Rule 706(a) [essentially the same as former Local District Rule 4–3(IV), which was effective during the events of the instant case].

■ 8. As a general proposition, a debtor does not waive the right to object later to fees already awarded to special counsel upon an application which the debtor endorsed, assuming that the objecting debtor makes a proper showing that newly-discovered evidence of wrongdoing by the special counsel justifies the denial of compensation.

9. The debtor has failed to produce evidence to support the rescission of Judge Bason's approval of the first allowance of interim compensation to D.S. & M.

■ 10. This Court has found no basis upon which to deny compensation to D.S. & M. as special counsel to Inslaw.

11. The Court specifically finds that D.S. & M. did not hold or represent an interest adverse to Inslaw with respect to the matters for which it was employed and that it was "a disinterested person" within the meaning of 11 U.S.C. § 101(13). *Cf. In re Inslaw, Inc.,* 55 B.R. 502 (Bankr.D.C. 1985) (Bason, B.J.).

12. D.S. & M. did not violate its ethical obligations to Inslaw, based upon all the credible evidence in the record.

13. The opinion formed by D.S. & M. regarding the likelihood of success of the Inslaw litigation was reasonable in light of the facts of the case and the applicable law.

14. Because the verdict against D.O.J. is now pending appeal in the U.S. District Court and because the complaint against D.O.J. is still pending before the D.O.T.C. A.B., D.S. & M.'s advice to settle the litigation may yet be vindicated.

15. Inslaw's allegations of wrongdoing on the part of D.S. & M. are built upon supposition, suspicion and uncorroborated hearsay, all of which this Court finds to be unworthy of belief.

16. There is no credible evidence in the record to support Inslaw's charge that D.S. & M. removed Leigh Ratiner from the case because it was pressured to do so by D.O.J. On the contrary, despite Mr. Ratiner's impending departure from the firm, he remained assigned as lead counsel until his own request to be relieved of his responsibilities regarding the litigation.

17. Inslaw's allegation that D.S. & M. committed legal malpractice by failing to adequately investigate the case against D.O.J. before filing the bankruptcy adversary complaint is not supported by the evidence. The Court finds that D.S. & M. undertook an extensive investigation of the facts from which it fashioned a cause of action. That investigation included consultations with William A. Hamilton and Inslaw's government contracts attorney, Harvey Sherzer, upon whose various representations D.S. & M. relied and upon which D.S. & M. had a right to rely. The investigatory stage of D.S. & M.'s representation was so thorough that it prevented the filing of the complaint until June, 1986. Inslaw Exhibit No. 32.

18. The inclusion or deletion of various allegations in the complaint filed in the bankruptcy court was a tactical, strategic decision reached by D.S. & M. and Inslaw in the best interests of the litigation, and was not based upon any improper motivation on the part of D.S. & M. The complaint, as filed, which omitted references to D. Lowell Jensen, was a superior litigation document, compared to the earlier draft. Inslaw Exhibits No. 3 and No. 4.

19. The complaint filed by Inslaw in the bankruptcy court, which withstood a motion to dismiss and which resulted in a substantial verdict against D.O.J., was based upon an innovative cause of action devised by D.S. & M. for which D.S. & M. is entitled to be fully compensated.

20. The letter retainer agreement did not preclude D.S. & M. from continuing negotiations at the highest levels of the Justice Department, which were undertaken with Inslaw's knowledge and consent, with a view toward settling all litigation between the parties.

21. The fact that the debtor was prepared to complain to Judge Bason about D.S. & M. as early as November 19, 1986, without prior notice to the law firm, on the basis of unsubstantiated rumors reveals the degree to which Inslaw mistrusted its special counsel.

22. "A basic tenet of the attorney-client relationship is that the client should have full faith and confidence in [the] attorney. In order to ensure this confidence, a client has the right to discharge [the] attorney at any time, either with or without cause." Note: *For a Few Dollars More: Client's Right to Discharge His Attorney Under a Contingent Fee Contract,* 9 Cardozo L.Rev. 913 (1986); *A.B.A./B.N.A., Lawyers' Manual on Professional Conduct,* 31:1004 (1988).

23. Inslaw agreed to the withdrawal of D.S. & M. as special counsel, based upon a mutual loss of confidence. Because the withdrawal of D.S. & M. was consensual, Inslaw cannot now be heard to complain that it was abandoned.

24. Nevertheless, D.S. & M. would have been fully justified in unilaterally withdrawing as special counsel, with court approval, based upon Inslaw's improper refusal to pay counsel fees already approved by the bankruptcy court. "A lawyer may withdraw if the client refuses to abide by the terms of an agreement relating to the representation, such as an agreement concerning fees or court costs or an agreement limiting the objectives of the representation." DR 2–110(C)(1)(d), *District of Columbia Model Code of Professional Responsibility.*

25. D.S. & M. was within its rights to insist upon the payment of fees ordered to be paid by the bankruptcy court in its Order of December 2, 1986. The refusal by Inslaw to remit to D.S. & M. those fees which the Court had ordered to be paid was unlawful.

26. A debtor-in-possession may not lawfully withhold payments of fees approved to be paid by court order in the absence of a timely filed objection, motion for reconsideration or appeal. Inslaw disobeyed a lawful order of this Court and did not formally object to the payment of fees to D.S. & M. until Inslaw filed the instant objection [P. 925] to D.S. & M.'s proof of claim on September 29, 1988.

27. Despite Judge Bason's statement at a hearing on February 5, 1988, to the effect that except for the withdrawal of D.S. & M., he would not have postponed the trial of the adversary proceeding, the record is clear that a postponement was clearly warranted based upon the additional time necessarily required to complete pretrial discovery. *Hearing Transcript*, Inslaw Exhibit No. 69, p. 83. This Court cannot find any evidence to suggest that the failure to complete discovery is chargeable to D.S. & M. The delay resulting from the postponement of the trial was not solely attributable to D.S. & M.'s withdrawal as special counsel and therefore D.S. & M. should not be penalized for such delay.

28. The Court does not interpret as an ultimatum D.S. & M.'s recommendation to Inslaw to negotiate a settlement with D.O.J. No settlement was ever reached with D.O.J. Therefore, D.S. & M. cannot be said to have pressured Inslaw to accept a settlement because D.O.J. never came to terms regarding any such settlement. Moreover, D.S. & M. did not commit legal malpractice by recommending a settlement amount prior to the completion of discovery, where D.S. & M. had already thoroughly investigated the case and where there has been no showing that facts later brought to light altered the result.

29. Where court approval is required for the engagement of special counsel, court approval is also required in order for special counsel to withdraw from representation. Moreover, "[i]n the context of litigation, the lawyer's right to withdraw ... is subject to the permission of the court." *A.B.A./N.B.A. Lawyers' Manual of Professional Conduct,* 31:1106 (1988). In the instant case, Inslaw filed the application for D.S. & M. to withdraw and Judge Bason approved the withdrawal.

30. Because the Court holds the withdrawal of D.S. & M. to have been proper, it will not deprive D.S. & M. of any part of its fee for efforts which might have been required to be duplicated by its successor special counsel. Duplication of effort in some respects is a necessary consequence of obtaining new counsel to step in the place of retiring counsel. Moreover, the Court has further satisfied itself that D.S. & M. has already voluntarily reduced its claim for remuneration respecting services which its successor was required to perform again.

31. The Court finds that D.S. & M. fully performed its ethical obligations to Inslaw during and after its withdrawal as special counsel, as required by the Model Code of Professional Responsibility:

> In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.

DR2–110(A)(2), *District of Columbia Model Code of Professional Responsibility.*

32. On the other hand, the Court has not determined that William Hamilton purposely misrepresented to D.S. & M. the number of privately-funded enhancements made by Inslaw to "PROMIS," but rather the Court finds that D.S. & M. entertained a reasonable belief under all of the circumstances that he had done so.

33. Inslaw insists that a memorandum [Inslaw Exhibit No. 68] dated May 5, 1986 which was prepared by Marion Holton, In-

slaw's director of product development, which was given to Leigh Ratiner and to D.S. & M. effectively disproves Richard Conway's denial that it was not until December, 1986 that he learned of the reduced number of privately-funded enhancements. In this insistence, Inslaw is incorrect. Ms. Holton testified that at the time the memo was prepared, her examination was far from complete, and it was not until December, 1986, that she concluded her investigation. This comports with Mr. Conway's recollection that December, 1986, was the first time he learned that Inslaw's own records did not support its claim to 1,000 privately-funded enhancements to "PROMIS."

■ 34. The holder of an administrative claim for counsel fees bears the burden of proof as to the reasonableness of the fees. *In re B & W Tractor Co., Inc.,* 38 B.R. 613. (Bankr.E.D.N.C.1984); *In re Underground Utilities Const. Co., Inc.,* 13 B.R. 735 (Bankr.S.D.Fla.1981).

35. Awards of counsel fees to attorneys serving as special counsel to a debtor-in-possession are governed by section 330(a) of the Bankruptcy Code:

§ 330. Compensation of officers.

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (1982 and Supp. IV 1986).

36. In this circuit, 12 factors required for the determination of counsel fees which are set forth in the leading case of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), have been held to be mandatory to the award of counsel fees in bankruptcy. *In re B & W Management, Inc.,* 63 B.R. 395 (Bankr.D.D.C.1986); *In re AOV Industries, Inc.,* 43 B.R. 468 (D.D.C. 1984); *In re Smith,* 24 B.R. 266 (Bankr.D. D.C.1982); and *In re Auto–Train Corp.,* 15 Bankr. 160 (Bankr.D.D.C.1981).

37. The 12 factors set forth in the *Johnson* case which are required to be considered in order to determine a reasonable counsel fee are:

1. The time and labor required.
2. The novelty and difficulty of the questions.
3. The skill requisite to perform the legal service properly.
4. The preclusion of other employment by the attorney due to acceptance of the case.
5. The customary fee.
6. Whether the fee is fixed or contingent.
7. Time limitations imposed by the client or the circumstances.
8. The amount involved and the results obtained.
9. The experience, reputation and ability of the attorneys.
10. The "undesirability" of the case.
11. The nature and length of the professional relationship with the client.
12. Awards in similar cases.

*Johnson v. Georgia Highway Express Inc., supra,* 717–719.

■ 38. In order to apply the foregoing standards to the determination of a reasonable fee award, the Court's inquiry begins with the so-called "lodestar," or guiding principle, which is "the number of hours reasonably expended multiplied by a reasonable hourly rate. The figure generated by that computation is the basic fee from which a trial judge should work."

*Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980).

39. The lodestar, or basic fee, in the instant case is $473,848.12, which is derived by multiplying the reasonable number of hours (4,032.75) times the customary hourly fee ($117.50). The Court finds that the actual hourly rates charged by the various attorneys at D.S. & M. who were assigned to the Inslaw litigation conform to the market rates prevailing in the community. *Johnson, supra* at 718; *Copeland, supra* at 892.

| ATTORNEY | HOURS WORKED | HOURLY RATE | FEE |
|---|---|---|---|
| G. Brown | 899.25 | | $ 86,858.75 |
| | 613.25 | 95. | |
| | 286.00 | 100. | |
| L. Ratiner | 754.25 | 180. | $135,765.00 |
| L. Shank | 625.00 | 85. | 53,125.00 |
| L. Menchero | 368.75 | 85. | 31,343.75 |
| R. Perkowski | 362.25 | 110. | 39,847.50 |
| M. Nannes | 319.25 | 125. | 39,906.25 |
| R. Conway | 193.25 | 170. | 32,852.50 |
| L. Garr | 167.25 | 140. | 23,415.00 |
| E. Sheehan | 130.50 | 75. | 9,787.50 |
| S. Floyd | 68.50 | 75. | 5,137.50 |
| B. Ortins | 47.75 | 85. | 4,058.75 |
| J. Schmidt | 42.50 | 75. | 3,187.50 |
| J. Dill | 25.50 | 125. | 3,187.50 |
| P. Kadzik | 16.50 | 125. | 2,062.50 |
| N. Lefkowitz | 14.25 | 125. | 1,781.25 |
| R. Wright | 11.75 | 125. | 1,468.75 |
| D. Gregory | 11.50 | 120. | 1,380.00 |
| J. Springer | 8.50 | 175. | 1,487.50 |
| R. Mazer | 3.00 | 160. | 480.00 |
| J. Simon | 3.00 | 170. | 510.00 |
| D. Shapiro | 2.00 | 250. | 500.00 |
| B. Levine | 1.75 | 200. | 350.00 |
| L. Garment | 1.50 | 250. | 375.00 |
| G. Kaufmann | 0.75 | 180. | 135.00 |
| J. Kleinmann | 0.75 | 150. | 112.50 |
| M. Beckman | 0.50 | 75. | 37.50 |
| M. Horowitz | 0.50 | 200. | 100.00 |

4079.75 SUBTOTAL   $479,252.50
TOTAL HOURS    4,079.75

BLENDED HOURLY RATE $117.50/hr.

*D.S. & M. Prehearing Memorandum,* Exhibit A.

The law firm has already discounted its fee. An exhaustive examination of the time records confirms a reduction in attorneys' hours charged from 4,079.75 to 4,032.75. In the discretion of the Court and based upon its careful consideration of the services performed, 4,032.75 will be deemed to represent a reasonable number of hours expended by D.S. & M. in the service of Inslaw. The law firm has also voluntarily reduced its average hourly rates from $117.50 to $91.00, thereby reducing the claim for counsel fees to $366,995.25. However, the higher fee computed by the Court in the amount of $473,848.12, based upon the customary hourly rate is the lodestar against which the 12 *Johnson* factors are to be weighed.

40. *Time and labor required.* The proof of claim [Claim No. 113] filed by D.S. & M. in the instant case, supported by its time records, indicates the expenditure of 4,079.75 hours by attorneys and 1,451 hours by paraprofessionals, for representation of Inslaw in the bankruptcy and D.O.T. C.A.B. litigation. These hours have been voluntarily reduced to 4,032.75 and 1,451 respectively. The Court is satisfied that the reduced numbers of hours expended by the various named individuals were reasonably required to perform the duties attendant to that representation, because of the complex nature of the causes of action involved.

41. *Novelty and difficulty of issues.* Great emphasis must be placed upon this factor because the Court finds that a great amount of time was required to develop the very novel and difficult issues which formed the causes of action in the bankruptcy court and the D.O.T.C.A.B. These issues involved litigating the violation of the automatic stay by D.O.J. and intricate questions of "Government Contract Law."

42. *Skill required and counsel's experience, reputation and ability.* D.S. & M. is a well-respected law firm, widely known for its litigation in the field of Government contracts. At trial, the Court was furnished with biographical material relating to the members of the firm and their associates which reflects their impressive edu-

cational backgrounds and noteworthy experience with complex cases. The attorneys at D.S. & M. who were assigned to handle the Inslaw litigation were highly-qualified and the highest degree of skill and judgment was necessary for the performance of this demanding work.

43. *Preclusion of other employment.* A high price paid by D.S. & M. for the representation of Inslaw, particularly in the early stages of that representation, was the complete preclusion of other employment by the attorneys assigned to the case, according to the well-documented time records which were submitted in support of the claim.

44. *Customary fee for like work.* The hourly rates and total fees charged by D.S. & M. for services rendered to Inslaw compare favorably to those charged for similar work outside the bankruptcy sphere by other large law firms located in the District of Columbia and its environs. D.S. & M.'s claim for counsel fees reflects a reduction of $112,257.25. D.S. & M. Exhibit No. 29. *Cf. Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354 (D.D.C.1983); *In re AOV, supra* at 472.

45. *Whether fee is fixed or contingent.* The fees charged by D.S. & M. in the instant case are contingent in the sense that they are subject to bankruptcy court approval and depend to a great degree upon the success of the litigation and the viability of the debtor-in-possession. The Court holds that the high risk inherent to special counsel in the representation of such a client as Inslaw is a factor which favors the approval of a more substantial fee than otherwise.

46. *Time limitation imposed by client or circumstances.* D.S. & M. worked under severe time constraints, dictated by the client's need for an expeditious disposition of its claims against the Government. Inslaw demanded counsel's prompt attention to the details of its litigation on a daily basis. (This factor also relates to factors 1 and 4.)

47. *Amount involved and results obtained.* The complaint in the bankruptcy court which was drafted by D.S. & M.

resulted in a $6,790,000 verdict for Inslaw. In relation to such a significant recovery, D.S. & M.'s claim for compensation in an amount less than $500,000 is eminently reasonable. Much of the credit for the successful outcome of the litigation belongs to D.S. & M.

48. *Undesirability of case in the legal community.* The high risk of debtor's special counsel not receiving compensation in the context of a Chapter 11 bankruptcy, coupled with counsel's representation of a demanding client and the intricate causes of action to be undertaken add up to a case that could be deemed to be undesirable in legal circles. The Court also notes from the record the apparent difficulty encountered by Inslaw in engaging special counsel to represent it in this case, based upon the withdrawals of both Howrey & Simon and Nixon, Hargrave, Devans & Doyle.

49. *Nature and length of professional relationship with the client.* While the duration of D.S. & M.'s representation was comparatively brief, the difficult and demanding nature of that representation justifies the payment of a premium fee to special counsel.

50. *Awards in similar cases.* The amount of fees claimed by D.S. & M. are completely justified in the context of the instant case when compared to court-approved awards made to other special counsel, namely McDermott, Will & Emery. D.S. & M. Exhibit No. 29.

51. The Court finds all of the services rendered to Inslaw by D.S. & M. to have been actual, necessary and beneficial to the bankruptcy estate. According to the *Johnson* factors, D.S. & M. is entitled to a fee substantially higher than that which is sought. Accordingly, a counsel fee in the requested amount of $366,995.25, will be approved.

52. Charges for services performed by paraprofessionals, in the amount of $61,051.25, representing an average hourly rate of $43.50, are reasonable. (*Cf. In re Management, Inc., supra,* decided in 1986, which set maximum hourly rates for law clerks and paralegals at $35 and $30,

respectively.) Given the circumstances in the instant case, this Court will allow an hourly rate for paraprofessionals as high as $75 where the so-called "blended rate" charged by all paraprofessionals, averages $43.50 and where the firm has significantly reduced its claim for attorneys' fees.

53. Expenses will be allowed in the full amount of $36,050.31, much of which represents sums advanced by the firm for document preparation and cataloging which the Court will not write off as overhead because of the extraordinary nature of services rendered.

54. D.S. & M. is entitled to an administrative priority claim against the estate in the amount of $464,096.81. 11 U.S.C. §§ 503(b)(4), 507(a)(1) (1982 & Supp. IV 1986).

55. For the sake of convenience, the counsel fee will be approved in an adjusted amount of $464,000. However, the entire $464,000 will not be accorded administrative priority status, based upon the following considerations. First, D.S. & M. is no longer special counsel to the debtor-in-possession. Current special counsel is presently engaged in prosecuting the bankruptcy court litigation on appeal. The success of that litigation is in doubt until the U.S. District Court renders its decision. The success of the case on appeal will determine in large measure the extent to which current special counsel and other administrative creditors will be paid. Necessary services of other counsel have yet to be performed for the benefit of the estate; those of D.S. & M. have been provided in the past. Second, the always-speculative nature of litigation undertaken on behalf of a bankruptcy estate must be given some weight in the decision. This means that the Court, in its inherent equitable jurisdiction, may consider the risk factor *against* D.S. & M. by subordinating a portion of its administrative claim to the administrative claims of others.

56. Accordingly, the Court will order that sixty percent (60%) of the $464,000 awarded will be paid at confirmation to D.S. & M. in the amount of $278,400. The remaining $185,600 will be paid to D.S. & M. out of the proceeds of any recovery resulting from the D.O.J. litigation after final appeal.

57. D.S. & M. is entitled to file an unsecured claim for counsel fees and expenses reasonably necessary for the instant litigation of the debtor's objection to its application for compensation.

## POSTSCRIPT

On December 16, 1988, the decision of this Court overruling Inslaw's objection to the proof of claim of D.S. & M. was announced to the parties. This permitted D.S. & M. the standing to be heard as an administrative creditor at the hearing on confirmation of Inslaw's Third Amended Chapter 11 Plan of Reorganization, which was held on December 19 and 20, 1988. The Plan was confirmed by Order [P. 1117] dated December 28, 1988. In the course of negotiations which occurred during the confirmation hearing, Inslaw and D.S. & M. came to the following agreement, dated December 23, 1988 [P. 1116]:

[2.] On the Consummation Date, as defined in the Plan, Debtor agrees to pay to Dickstein the sum of Seventy One Thousand Fifty Dollars ($71,050.00) on account of its allowed claim of $278,400.00.

[3.] Dickstein agrees that the "amount of interim compensation allowed to them for payment by prior Orders", as defined on page 11 of the Plan, shall be Two Hundred Seven Thousand Three Hundred Fifty Dollars ($207,350.00).

[4.] Dickstein consents to the payment by the Debtor, from the Three Hundred Fifty Thousand Dollars ($350,000.00) set aside for Class 4 claims in the Plan, of the following amounts, prior to distribution of the balance pro rata as set forth in the Plan: (a) ($71,050.00 to Dickstein; (b) $30,000.00 to Zuckerman, Spaeder, Goldstein, Taylor & Kolker ("Zuckerman"); and (c) $5,000.00 to Kaufman, Davis, Ruebelmann, Posner & Kurtz ("Kaufman").

[5.] The Zuckerman and Kaufman firms shall not be entitled to any further distribution pro rata from the Class 4 sum of $350,000.00.

[6.] The balance of the $350,000.00, which is $243,950.00, shall also be distributed on the Consummation Date pro rata as provided in the Plan.

[7.] Zuckerman and Kaufman shall receive $7,500.00 and $2,500.00 from the quarterly distributions of $100,000.00 to Class 4 creditors but shall not be entitled to any further pro rata distribution.

[8.] Dickstein shall be entitled to a pro rata distribution of the $100,000.00 quarterly payments and the excess net cash flow payments, all as more fully set forth in the Plan on page eleven.

[9.] Dickstein shall be treated as having received a "particular award of attorneys fees and costs as part of the judgment [against the Department of Justice] rendered in favor of the Debtor," as more fully described on page eleven of the Plan, in the amount of $185,600.00. Dickstein shall be entitled to be a pro rata distribution of judgment proceeds with other counsel having an award of attorneys fees from the judgment, before any distribution is made to any other entity under the Plan.

[10.] Dickstein shall have a general unsecured Class 14 claim for attorneys fees and expenses incurred by Dickstein in defending the Objection to Claim filed by the Debtor to the Dickstein claim. The amount of the claim for fees only shall not exceed a maximum of $90,000.00. Dickstein shall have thirty days from the date hereof to file a proof of claim for such fees and expenses. Dickstein agrees to attach to the proof of claim detailed time sheets detailing services rendered, summaries of expenses incurred and affidavits from Dickstein and its bankruptcy counsel, Weinberg and Green, certifying to the correctness of the amounts stated therein. The Debtor agrees that it will not object to the amounts claimed so long as the total amount claimed for fees does not exceed $90,000.00 and so long as affidavits certifying to the correctness of the fees are attached to the proof of claim.

[11.] Dickstein waives its right to receive cash at confirmation equal to the amounts allowed to Dickstein, pursuant to the order of the Bankruptcy Court, which are administrative claims in the bankruptcy proceeding, which right is set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

[12.] The Debtor waives its right to appeal the order and judgment entered or to be entered by the Bankruptcy Court which, *inter alia,* overruled Inslaw's objections to the Dickstein claim. If the order and judgment have not been entered as of the date hereof, the Debtor agrees to execute another written waiver of its right to appeal the order and judgment when same is entered. The aforesaid order and judgment shall accordingly be deemed final for all purposes.

[Signatures omitted.] *Agreement* dated December 23, 1988 [P. 1116].

At the hearing on confirmation, D.S. & M. voted to confirm Inslaw's Third Amended Plan of Reorganization.

By reason of the foregoing Agreement which materially altered the original disposition of this Court regarding the payment of fees and expenses to D.S. & M., a separate Order will be entered which merely overrules the debtor's objection to D.S. & M.'s proof of claim.

## ORDER OVERRULING DEBTOR'S OBJECTION TO PROOF OF CLAIM FOR FEES BY SPECIAL COUNSEL

The objection of the debtor to counsel fees of Dickstein, Shapiro & Morin in the amount of $464,000 is OVERRULED, *nunc pro tunc* as of December 16, 1988.

IT IS SO ORDERED.