Justice LEHRMANN, joined by Justice MEDINA, and Justice GREEN,
dissenting.
I agree that a court should review an attorney-client agreement from the perspective of a reasonable person in the client’s circumstances when deciding whether it is subject to two or more reasonable interpretations. I disagree, however, with the Court’s assumption that an agreement on firm letterhead unambiguously creates an agreement with the firm. The use of letterhead must be viewed in light of clear evidence that the client understood the firm had refused to represent him in the case due to large unpaid legal bills, the lawyer’s testimony that his seere-tary mistakenly used firm stationery, and the fact that the agreement referred solely to the individual lawyer and contemplated a fee structure where only that lawyer’s time would be compensated. I therefore am compelled to respectfully express my dissent. I would affirm the court of appeals’ judgment and hold that the trial court correctly determined the agreement was ambiguous and properly submitted the agreement’s meaning to the jury.
I. BACKGROUND
Scott Van Dyke, the president of Anglo-Dutch, and Swonke, the attorney, had a long-standing relationship that began when Van Dyke worked at another company. Swonke was “of counsel” at the law firm of Greenberg Peden when the subject agreement was executed in 2000. One of the firm’s founders testified at trial that Greenberg Peden understood Swonke sometimes contracted with clients the firm did not want to represent, and it was understood these were Swonke’s “side deals”. Greenberg Peden had the right of first refusal for all of Swonke’s potential clients.
In 1997, when Anglo-Duteh committed to develop an oil field in Kazakhstan with two business partners, Halliburton and Rameo, Van Dyke contacted Swonke to prepare the necessary documents. It is undisputed that the parties understood that Greenberg Peden, not Swonke individually, took on the representation at that time. No formal fee agreement was signed. The joint project ended in early 2000 when Halliburton and Rameo alleged *456 ly breached the parties’ confidentiality agreement and disclosed Anglo-Dutch’s confidential data to third parties. Van Dyke consulted with Swonke, who advised him that Anglo-Dutch had viable claims against Halliburton and Rameo.
Around the same time, Anglo-Dutch ceased paying Greenberg Peden’s bills and began accumulating a large account payable to the firm. Anglo-Dutch’s unpaid legal bills prompted Greenberg Peden to stop working for Anglo-Dutch in 1999. By early 2000, Anglo-Dutch owed Greenberg Peden more than $200,000. It is undisputed that Van Dyke asked if Greenberg Pe-den would represent Anglo-Dutch in the lawsuit against Rameo and Halliburton, but the firm refused to take on any more work for Anglo-Dutch because of Anglo-Dutch’s unpaid bills and a history of difficulty in collecting fees from Anglo-Dutch.
Unable to retain Greenberg Peden, Anglo-Dutch, based on Swonke’s recommendation, hired the law firm of McConn & Williams under a twenty percent contingency fee arrangement. As the Halliburton lawsuit progressed, Van Dyke asked Swonke to serve as an advisor to McConn & Williams because of his familiarity with the underlying contracts. After initially consulting for free, Swonke requested compensation as his involvement in the case became more substantial. McConn & Williams declined to pay Swonke because the firm’s contingency fee interest was not large enough, so Van Dyke called Swonke directly and offered to pay him for the work. It is undisputed that Van Dyke and Swonke negotiated the terms of Swonke’s representation and that Swonke finally agreed to accept compensation in the form of a fraction of the total recovery calculated based on the hours he worked, divided by the total hours billed by the McConn & Williams attorneys.
Swonke dictated the body of the one-page agreement and his secretary printed it on Greenberg Peden letterhead, with a Greenberg Peden signature block. Swonke signed his name under the Green-berg Peden signature block and sent the agreement to Van Dyke, who signed and returned it the next day. Swonke testified he did not notice the letterhead or the signature block and did not think to correct them at any point because he and Van Dyke both knew the agreement was personal to him.
The day he signed the agreement, Van Dyke also drafted and sent Swonke a separate transmittal letter attaching a copy of the McConn & Williams contingency fee agreement. The letter said that the McConn & Williams document “provides the basis for the Agreement between Greenberg Peden P.C. and Anglo-Dutch.” At trial, Swonke questioned Van Dyke’s motives for sending the letter separately from the main agreement, and for sending it at all as Van Dyke had previously given him the McConn & Williams agreement. Swonke testified that he did not read the letter, and would not normally read a transmittal letter referring to a document he already had in his files.
Swonke worked on the Halliburton lawsuit for 277 hours while at Greenberg Pe-den. After Greenberg Peden dissolved in 2001, Swonke joined McConn & Williams as “of counsel”. McConn & Williams and Swonke agreed that he would not share in the firm’s fees from the Halliburton lawsuit, but did not relay that agreement to Anglo-Dutch. Swonke did inform Anglo-Dutch of his move to McConn & Williams, and told Anglo-Dutch he planned to take his client files with him unless Anglo-Dutch objected. Receiving no objection, Swonke worked 1,022 hours on the matter at McConn & Williams.
*457 Anglo-Dutch won a $70.5 million verdict against Halliburton and the parties stipulated to $9.8 million in attorney’s fees. The verdict was appealed and Halliburton ultimately settled the case for $51 million in 2004. A few days before Halliburton was going to wire the attorneys’ fees portion of the settlement to individuals and firms involved in the case, Swonke’s name was removed from the wiring instructions at Van Dyke’s request. Noting the change, Swonke e-mailed Van Dyke asking how he wanted to handle his compensation. Prior to discussing payment, Van Dyke requested that Greenberg Peden assign any interest under the Anglo-Dutch agreement to Swonke, purportedly to avoid any possible problems with multiple claims for attorney’s fees. Swonke contacted Green-berg Peden, and the no-longer operating firm’s representatives agreed to the assignment in exchange for a ten percent fee from all amounts collected by Swonke from Anglo-Dutch, an amount consistent with their original agreement that he would pay the firm a flat ten percent to cover overhead for matters handled by Swonke individually.
Soon after obtaining the assignment letter, Van Dyke informed Swonke that he’d consulted lawyers and determined that Anglo-Dutch’s contract was with Greenberg Peden and not with Swonke individually. Accordingly, Van Dyke refused to include the hours billed after Swonke left Green-berg Peden in the contingency ratio, a position that would reduce Swonke’s total compensation due by over a million dollars. Swonke asserted that the agreement was personal to him and that he should be paid for all of the work he performed for Anglo-Dutch. It is undisputed that had the trial court determined that the agreement was with Greenberg Peden, Anglo-Dutch would be able to calculate the compensation ratio based solely on the 277 hours Swonke billed while at Greenberg Peden. Anglo-Dutch argued that the 1,022 hours Swonke billed at McConn & Williams were covered by that firm’s contingency percentage.
II. APPLICABLE STANDARDS
I agree with the standards the Court applies in determining whether this attorney-client agreement is ambiguous. Ambiguity is determined by examining the contract as a whole in light of the circumstances present when the contract was entered. Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.1996). When an agreement’s language is ambiguous in light of the circumstances present when the parties entered into it, its meaning becomes an issue for the fact-finder. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.2003); see Columbia Gas, 940 S.W.2d at 589.
I also agree that there are limits. Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex.1981). Parol evidence will not be received to create an ambiguity or to give a contract a meaning different from that imparted by its language. David J. Sacks, P.C. v. Haden, 266 S.W.3d 447, 450-51 (Tex.2008) (citations omitted). Courts may not consider the parties’ interpretation or “admit extraneous evidence to determine the true meaning of the instrument” if the express language of the agreement may be interpreted in only one way. Id. at 450 (quoting Nat’l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex.1995)). Ambiguity likewise does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. See Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 866 (Tex.2000); Nat’l Union Fire Ins., 907 S.W.2d at 520.
*458 Further, as the Court observes and Anglo-Dutch and amici[1] contend, clarity is obviously critical, and courts should therefore view the agreement from the perspective of a reasonable client to determine if it is susceptible to more than one reasonable interpretation. Such a rule will protect clients from unscrupulous attorneys, reduce disputes, and create a predictable rule that is in the best interest of the legal system, individual clients, lawyers, and law firms.
And it is beyond dispute that attorney-client agreements are subject to heightened scrutiny by the courts because of the fiduciary nature of the attorney-client relationship. See Hoover Slovacek LLP v. Walton, 206 S.W.3d 557, 560 (Tex.2006). The attorney, unlike a commercial party to an agreement, bears a duty to ensure the client understands the terms of the representation because of the trust the client places in the attorney. See Levine v. Bayne, Snell & Krause, Ltd., 40 S.W.3d 92, 95 (Tex.2001). To fulfill this duty, the lawyer must be clear.
Like the Court, I believe that the approach set out in the Restatement of the Law Governing Lawyers is workable. See Restatement (Third) of the Law Governing Lawyers § 18, cmt. h. Under this approach, such agreements should be viewed from the perspective of a reasonable client, taking into consideration the parties’ relative bargaining power and other circumstances surrounding the agreement. See id. A reasonable client to whom this standard is applied is “a reasonable person in the client’s circumstances.” Id. I do not agree, however, that any potential ambiguities should be resolved against the attorney.
III. ASSESSING AMBIGUITY IN ATTORNEY-CLIENT AGREEMENTS
The evaluation of whether an agreement is subject to multiple reasonable interpretations should be made from the perspective of a reasonable person in the client’s circumstances. This does not mean, as Anglo-Dutch and the Court presume, that the individual client’s interpretation prevails. Instead, the reasonableness of potential interpretations will be viewed from the reasonable client’s perspective, taking into consideration the circumstances surrounding the agreement’s formation, such as the parties’ past dealings, their relative bargaining power, and the client’s experience negotiating such agreements to determine whether the agreement was “truly negotiated”. See id. If the court determines, as a matter of law, that the agreement is subject to more than one reasonable interpretation from a reasonable client’s perspective, construction of the agreement becomes a fact issue for the judge or jury to resolve.
The Court claims not to construe the agreement against the attorney. See Levine, 40 S.W.3d at 94; Lopez, 22 S.W.3d at 860-61. However, in concluding that the circumstances surrounding the agreement do nothing to negate the letterhead on which the agreement was printed, the Court does just that. The Restatement emphasizes that in applying the reasonable client standard, courts should not ignore “the usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was *459 made, and the client’s sophistication and experience in retaining and compensating lawyers or lack thereof.” Restatement (Third) of the Law Governing Lawyers § 18, cmt. h. An agreement should be “construed in light of the circumstances in which it was made, the parties’ past practice and contracts, and whether it was truly negotiated.” Id.
Undoubtedly, Swonke’s use of the Greenberg Peden letterhead in this case contributed to the agreement’s ambiguity. But in times of increasing fluidity in the legal profession, the solution the Court implements — to construe agreements based on the letterhead regardless of the parties’ understanding of their terms— could lead to unnecessarily harsh results: a lawyer who made a mistake in choosing stationery — or even used the only stationery available — would lose. See Milton C. Regan, Jr. & Palmer T. Heenan, Supply Chains and Porous Boundaries: The Disaggregation of Legal Services, 78 Fordham L.Rev. 2137, 2191 (2010) (noting that the economic downturn marks a “transition for law firms less because of its immediate financial impact and more because it has highlighted and accelerated the trend toward the disaggregation of legal services that had begun before it”). While the entire Court would hold lawyers to a standard of reasonable clarity, perfection is not required. The Court’s analysis of the agreement should focus on the terms as negotiated and agreed to, not on interpretations that the parties (and, at times, their counsel) have subsequently adopted in light of the changed circumstances. While giving due weight to a lawyer’s fiduciary obligations, we should do so from a reasonable, not predatory, client’s perspective.
1. Reasonableness of alternative interpretations
The Court holds that, even applying the Restatement’s approach, a reasonable client would only interpret the agreement to be with Greenberg Peden. I disagree with that mechanical approach: application of the factors outlined in the Restatement leads me to conclude that the agreement is subject to multiple reasonable interpretations under the circumstances and thus ambiguous. The express terms of the Anglo-Dutch agreement cast doubt that it could only be understood to form a contract with Greenberg Peden from a reasonable client’s perspective.
The Anglo-Dutch agreement invites more than one reasonable interpretation of the parties’ intentions in spite of the fact that it was printed on Greenberg Peden letterhead and signed under a Greenberg Peden signature block. First, the body of the agreement did not reference Green-berg Peden while it referred to McConn & Williams by name five separate times. It defined the client as “you and/or the companies which you control (Anglo-Dutch)” but exclusively used personal pronouns throughout to refer to Swonke. The one-page document repeatedly used language such as “I agree to assist Anglo-Dutch and [McConn & Williams] for proportionately the same percentage (20%) of any benefit to McConn & Williams;” “the proportions under which my fees shall be calculated will be the ratio of the hours I have spent ... relative to the hours [of McConn & Williams attorneys];” “if ... I spent 90 hours of my time towards the lawsuit, ... I would be entitled to receive;” “I shall be entitled to the benefit of any amendment;” “I will not be responsible for any expenses other than those I may personally incur;” and the like.
Second, the fee structure contemplated by Anglo-Dutch and Swonke, which based Swonke’s compensation solely on the hours he individually billed, creates an ambigui *460 ty, especially when compared to other firm fee agreements. The applicable provision states that:
the proportions under which my fees shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage.
The four corners of the Anglo-Dutch agreement indicate that Anglo-Dutch and Swonke negotiated a contingency fee based solely on the hours Swonke (and no other Greenberg Peden attorneys or support staff) worked on the lawsuit, divided by the total hours billed by “the attorneys at McConn & Williams.”[2] It is helpful to contrast this fee structure with the structure of the law firm agreement in Sacks, which likewise contained personal pronouns:
My ... rate for this particular matter will be $200.00 per hour. The other lawyers in my firm range from $150.00 to $200.00 per hour, and paralegals range from $50.00 to $100.00 per hour. You are responsible for all costs and expenses in the case as incurred. These expenses include, but are not limited to, copies; binding; fax transmissions; travel; lodging; parking; etc.
Sacks, 266 S.W.3d at 448-49.
While the Anglo-Dutch agreement stated Swonke would not be responsible for expenses, it did not anticipate compensation beyond one attorney’s billable hours. Compare Anglo-Dutch, 267 S.W.3d at 460-61 with Sacks, 266 S.W.3d at 448-49; In re Inslaw, Inc., 97 B.R. 685, 688 (Bankr.D.D.C.1989) (discussing an hourly law firm agreement stating that “[m]y partner ... will be billed at $170 and all other attorney or paralegal time will be billed at this law firm’s normal rate for that person”); In re Enron Corp. Sec., Denv. & ERISA Litig., 586 F.Supp.2d 732, 767 and n. 32 (S.D.Tex.2008) (recognizing that law firm contingent fees take resources into account by holding that “in light of the complexity and difficulty of the litigation, the fee percentage would have to be sufficient to create adequate incentives for the firm to dedicate the substantial resources, possibly over a long period of time”). The agreement’s compensation ratio and the use of personal pronouns throughout, in conjunction with its use of Greenberg Peden letterhead and the Greenberg Peden signature block, make it open to more than one reasonable interpretation. Accordingly, it must be read in light of surrounding circumstances. See Columbia Gas, 940 S.W.2d at 589; Sun Oil, 626 S.W.2d at 731.
2. Circumstances surrounding the agreement
It is undisputed that Van Dyke knew Greenberg Peden had refused to represent Anglo-Dutch in the Halliburton lawsuit due to the large amount of unpaid legal bills and the history of difficulty in collecting fees from Anglo-Dutch. Van Dyke admitted that he knew that Anglo-Dutch’s account payable exceeded $200,000, and that Greenberg Peden therefore wanted to play no part in the lawsuit against Halliburton. Given this admission, it is difficult to see how a reasonable client in Anglo-Dutch’s position could have believed that the agreement was with the firm, rather than with Swonke.
Moreover, it is undisputed that the contract in this case arose in the context of genuine negotiations between Swonke and the client, both of whom had previous ex *461 perience negotiating such agreements. Van Dyke testified that negotiating agreements was a significant portion of his job. He testified that Anglo-Dutch retained other counsel prior to switching to Green-berg Peden and had another attorney draft a demand letter to Halliburton prior to retaining McConn & Williams. Further, Van Dyke testified that he and Swonke had many discussions about contract drafting over the years, and Swonke had even given Van Dyke advice on best practices when drafting agreements.
Concerns that an attorney could exercise undue influence over an existing client are valid, but they are minimized here because this agreement was truly negotiated. The agreement was not suggested by Swonke to an uninformed and agreeable client — to the contrary, Van Dyke proposed it to ensure that he would continue to receive the benefit of Swonke’s experience when McConn & Williams refused to compensate Swonke for his services. Although the Anglo-Dutch agreement is only one page, both Van Dyke and Swonke testified that they negotiated its terms. Significantly, there is undisputed evidence that Van Dyke, not Swonke, suggested the unusual compensation ratio that Swonke initially resisted, requesting a flat percentage fee instead.
Viewing the agreement from a reasonable client’s perspective, I disagree that Anglo-Dutch’s interpretation is the only reasonable one. Certainly, the use of personal pronouns in an engagement letter does not alone create an ambiguity as to whether the client hired a law firm or an individual lawyer. To be reasonable, an alternative interpretation must be one a client could reasonably understand from the agreement’s language and the circumstances of the negotiation between the parties. Yet the negotiations between the parties demonstrate an understanding that the law firm of Greenberg Peden was uninterested in future work for Anglo-Dutch, and Swonke negotiated the compensation for himself individually. The Court is persuaded by the letterhead on which the agreement was printed after its terms were already negotiated and accepted by both parties, and by the language of a Greenberg Peden assignment of interest letter, signed years after the agreement was reached. Neither one bears on the parties’ understanding at the time they reached their agreement.
I would hold that the language of the agreement, as shown by the compensation ratio, the use of personal pronouns, the use of Greenberg Peden letterhead and the Greenberg Peden signature block, together with the circumstances surrounding the agreement’s formation, made it open to multiple interpretations. The use of the letterhead could lead a reasonable client to believe the agreement was with the law firm. However, it was every bit as reasonable, given Greenberg Peden’s repeated refusal to do more business with Anglo-Dutch, for the client to understand that it was a personal agreement with Swonke. Van Dyke’s undisputed testimony that the firm declined all further representation of Anglo-Dutch highlights the ambiguity resulting from the circumstances surrounding the agreement’s formation. His one-paragraph letter to Swonke, describing it as the agreement between “Anglo-Dutch and Greenberg Peden,” showed only Anglo-Dutch’s self-serving interpretation of the agreement, not whether it would unmistakably be understood that way by a reasonable client given the scope of the agreement. Moreover, because the letter is external to the contract’s formation, it is not properly considered in determining whether the agreement is ambiguous.
Consideration of the language of the actual contract and the circumstances sur *462 rounding its formation lead me to conclude that the fee agreement was ambiguous as a matter of law. Accordingly, I would hold that the trial court properly submitted the agreement’s construction to the jury. Because the Court effectively construes the agreement against the lawyer, I am compelled to respectfully express my dissent.

. Two amicus briefs were submitted in support of Anglo-Dutch: one by Linda Eads, Associate Professor of Law at the Dedman School of Law and another by the law firms of Abrams Scott & Bickley, L.L.P.; Arnold & Itkin LLP; Caddell & Chapman; Cornell, Smith & Mierl, LLP; Dawson, Sodd, Ellis & Hodge LLP; Law Office of James M. McCor-mack; and Quilling, Selander, Cummiskey & Lownds, P.C.

. Anglo-Dutch’s agreement with McConn & Williams provided for a flat 20 percent contingency fee, later reduced to 16 and 2/3 percent.